RECEIPT #
AMOUNT $ _150_
SUMMONS ISSUED _Y. 2_
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. _A_
DATE_____ _12·31·03_

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ELLEN P. MERRILL, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant | ) |
| | ) |

Civil Action No.

# 03 ᶜᵛ 1 2 6 5 2 RCL

**COMPLAINT**

MAGISTRATE JUDGE _Dein_

## *Nature of the Action*

1)    This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671-80, for damages sustained by the Plaintiff as a result of her having been subjected to non-therapeutic, human experimentation without informed consent at a United States Army facility in Natick, Massachusetts in January of 1999.

## *Jurisdiction and Venue*

2)    This court has subject matter jurisdiction over this case under 28 U.S.C. § 1346(b).  Venue in this Court is proper because the Plaintiff is and was at all times referred to herein a resident of the judicial district in which this case was brought and the events complained of occurred primarily within this district.

## *Factual Allegations*

3)    The Plaintiff Ellen P. Merrill ("Ms. Merrill") is an individual with a primary place of residence in Newton, Massachusetts.  The Plaintiff was formerly known, and was known at the time of the incidents described herein, by her maiden name, which was Ellen P. Jasset.

4)    In September of 1998 Ms. Merrill was working at the United States Army's Research Development and Engineering Center in Natick, Massachusetts as a civilian employee of a company that was, upon information and belief, a government contractor.  She was at that time a twenty-seven year old woman who was in good physical condition, riding her bike approximately nine miles each way to and from work on a regular basis, and regularly participating in sports and exercise.  Her job duties did not include serving as a subject for experiments conducted upon human beings.

5)    In connection with her work at the United States Army's facility in Natick, Ms. Merrill had occasion to interact with various employees of the United States of America who either worked for or were associated with the Army's Research Institute of Environmental Medicine ("USARIEM"), which was also located at the Army's facility in Natick.  Those employees included individuals who were, in the course of their employment, engaging in experimentation on human subjects.

6)    Upon information and belief, during a period commencing prior to September of 1998 and continuing up to at least January 9, 1999, some of the employees who worked at or were associated with USARIEM undertook to create, supervise and carry out on human subjects an experiment entitled *Effects of Modified Egg Protein and Antioxidant Supplementation on Muscle Soreness and Strength after Eccentric Exercise* (the "Experiment").  Upon information and belief, the employees in question included Major William H. Karge, Ph.D., Jennifer L. Jenner, Ph.D., John F. Patten. Ph.D., Robert Mello, and various other employees of the United States of America whose names or precise involvement are presently unknown to Ms. Merrill but who, while acting in the course of and within the scope of their employment by the United States

2

of America, participated in creating, supervising, and carrying out the above-referenced Experiment (all of said employees being hereinafter referred to collectively from time to time as the "Army Experimenters").

7)    Upon information and belief, studies such as the Experiment were considered to be useful and relevant from a military perspective because the United States Army knew from several decades of experience that military recruits undergoing basic training and other military personnel involved in stressful environments had contracted certain debilitating conditions as a result of their having been subjected to "*eccentric exercise*," i.e. the use or exercise of muscles in a manner to which they were not accustomed.  These conditions included muscular/skeletal damage and disease, protracted muscle weakness, kidney damage, renal failure, and a potentially fatal disease known as "*acute exertional rhabdomyolysis*," the existence of which can be confirmed through blood samples and inferred from the victim's expulsion of dark brown urine. Rhabdomyolysis is defined in Stedman's Medical Dictionary for the Health Professions (Third Edition, Williams and Wilkins, 1977) as follows:

> *[An] acute, fulminating, potentially fatal disease of skeletal muscle that entails destruction of muscle as evidenced by myoglobinemia and myoglobinuria.*

8)    Upon information and belief, as of September of 1998, and at all times referred to below, the Army Experimenters knew or should have known that the risks associated with eccentric exercise included risks of muscular/skeletal damage and disease, protracted muscle weakness, kidney damage, renal failure, rhabdomyolysis and death.

9)    In or around September of 1998, the Army Experimenters, and specifically William H. Karge, advised Ms. Merrill that she would be a good candidate to participate, as a

subject, in a certain form of human experimentation that they were conducting with respect to what they described as *"unaccustomed eccentric exercise."* The Army Experimenters offered to pay Ms. Merrill six hundred dollars ($600) if she participated in and successfully completed the Experiment. As explained to Ms. Merrill by the Army Experimenters (and specifically William H. Karge and Jennifer L. Jenner), and as was later set forth in a writing that was prepared by and provided to Ms. Merrill by the Army Experimenters in an effort to secure her consent to being subjected to human experimentation, (a copy of which has been attached hereto as Annex A):

> *Unaccustomed eccentric exercise, which involves stretching your muscles more than normal, is followed by a period of muscle soreness. We will be testing whether or not taking a diet supplement, such as a modified egg protein and/or vitamins C and E will shorten the time it takes you to recover from muscle soreness after doing the exercise once.*
>
> *This exercise involves using your muscles in a way that you are not used to using them. You will exercise on a specially designed bike called a cycle ergometer. The pedals of the bike will be driven backward by a motor and you will try to keep them from going backward. After doing this exercise, you legs will feel very sore. This type of soreness is typically felt when anyone begins an exercise program or increases their training program. You will experience the most soreness one to three days after the exercise. During this time you will have difficulty walking up or down stairs and you will not be able to run. You should be able to walk gently and should feel little discomfort when you are just sitting or resting. After several days the soreness will go away completely.*

(Quoting from Annex A to the Complaint, consisting of Natick Form 1487, entitled *"Volunteer Agreement Affidavit,"* Part B at Page 2, entitled *"Instructions for Elements of Informed Consent."*)

   10)    In addition to informing Ms. Merrill that the risks associated with the Experiment included *"soreness [which] will go away completely... [a]fter several days,"* the Army Experimenters advised Ms. Merrill that they would be drawing blood samples from her arms as part of the Experiment, and that there was, accordingly, *"a small risk of a bruise forming at the*

*puncture site, but this will gradually disappear. There is also a risk that you may feel faint or dizzy during this procedure.... There will be discomfort when the catheter initially punctures your skin. There is a small chance that you might develop a bruise at the site of the puncture, and it is possible than an infection might occur...."* The only other risk that was disclosed to Ms. Merrill in connection with the Army Experimenters' attempt to obtain her consent to participate in the Experiment was that, during the course of the exercise itself, *"[t]here is a chance that you could twist an ankle."* See generally, in this regard, Annex A at page 6.

11)     During the period from September of 1998 through January 4, 1999, the Army Experimenters continued to provide Ms. Merrill with information concerning the Experiment. None of that information was inconsistent with the Army Experimenters' advice to her that she was a good candidate to participate in the Experiment, and none of that information disclosed that the risks associated with eccentric exercise included risks other than a few days of muscle soreness and a potential twisted ankle.

12)     At the time that the Army Experimenters were providing information to Ms. Merrill concerning the risks associated with unaccustomed eccentric exercise and her suitability for serving as a human subject, and at all subsequent times up to and including January 4, 1999, they understood that there was no therapeutic benefit to Ms. Merrill associated with the Experiment, and they understood that she had not sought and was not seeking any medical care.

13)     The Army Experimenters failed to inform Ms. Merrill about matters that they should have informed her about given the status and relationship of the parties and the fact that they were attempting to secure her consent to non-therapeutic, human experimentation, including the information referred to in paragraphs 7 and 8 above.

14) Based upon the information that was, and was not, disclosed to her, Ms. Merrill agreed to permit herself to be subjected to the Experiment.

15) But for the Army Experimenters' failure to disclose information that should have been disclosed to Ms. Merrill in order to seek her informed consent, Ms. Merrill would not have participated in the Experiment.

16) On January 4, 1999, the Army Experimenters subjected Ms. Merrill to non-therapeutic human experimentation, having her perform eccentric exercise in a "Testing Room" at the Army's Facility in Natick as part of the Experiment, and observing her and drawing blood from her arm as she did so.

17) During the course of the eccentric exercise to which Ms. Merrill was subjected on January 4, 1999, Ms. Merrill experienced great difficulty and physical stress and, upon information and belief, was understood by the Army Experimenters to be experiencing great difficulty and physical stress. During the course of the eccentric exercise portion of the Experiment on January 4, 1999, the Army Experimenters did not inform Ms. Merrill that the risks associated with what she was undergoing included risks that had not been disclosed to her. Had they done so, she would have stopped and ended her participation in the Experiment at that time.

18) Upon the conclusion of the eccentric exercise portion of the Experiment on January 4, 1999, the Army Experimenters instructed Ms. Merrill to eat a so-called "Power Bar," which reportedly consisted of either a placebo or a diet supplement such as modified egg protein and/or vitamins C and E.

6

19)     Following the completion of the eccentric exercise portion of the Experiment on January 4, 1999, Ms. Merrill experienced severe leg cramping and pain in her right foot and had difficulty walking without crutches. On January 5, 1999, she was told that she had sustained a strained Achilles tendon and that she was being suspended from the exercise portion of the Experiment for a two-day period. In all other respects, she continued to be subjected to the Experiment, and continued to be examined by the Army Experimenters and to have blood drawn from her arms.

20)     On the night of January 6, 1999, Ms. Merrill discovered that her urine had turned dark brown.

21)     Shortly after dawn on the following morning, January 7, 1999, Ms. Merrill succeeded in contacting the Army Experimenters, including Jennifer L. Kenner. Ms. Merrill advised them that her urine had turned dark brown. She was instructed to report to the Testing Room and did so. She was then directed to a clinic at the U.S. Army's facility in Natick, where she was given saline solution intravenously throughout the rest of the day. When the clinic closed that afternoon, she was told to go home and *"drink plenty of fluids."* She was also told to take hot baths to deal with her muscular pain, and she was given some pager numbers to call if she continued to have problems.

22)     On the following day, January 8, 1999, Ms. Merrill stayed at home, suffering from extensive muscular pain and continuing to have discoloration of her urine. She attempted, without success, to get someone to call her back through the use of the pager numbers. Later that day, out of concern over the continuing pain and discoloration of her urine, she went to a local hospital, where she was promptly diagnosed as having a severe case of *"acute rhabdomyolysis"*

caused by *"severe exercise."* In the early morning hours of January 9, 1999, she was admitted into the intensive care ward and provided with aggressive treatment to mitigate the risk of renal failure.

23) As a result of the Army Experimenters' failure to inform Ms. Merrill, following the completion of the exercise portion of the Experiment on January 4, 1999, about the risks associated with what she had been subjected to, Ms. Merrill was deprived of the opportunity to make an informed decision on whether to stop her participation in the Experiment and on whether to elect to seek care at a hospital during the period from January 4, 1999 through January 8, 1999.

24) As a result of her admission into the intensive care ward on January 9, 1999, Ms. Merrill was no longer available to the Army Experimenters, and she ceased being subjected to the Experiment as of that date.

25) Ms. Merrill remained in the hospital for seven days and continues to suffer from medical conditions that were caused by the Experiment up to the present day, including trochanteric bursitis, disfigurement of her leg muscles, scarring from medical procedures, and daily pain. As a result of these conditions, she has lost time from work and incurred medical expenses, has been unable to engage in activities that she used to engage in extensively, such as sports, exercise and dance, and has been limited in the activities that she can undertake, resulting in a substantial diminishment of her enjoyment of life. In addition, as a result of the invasive nature of the Experiment, the lack of information that she had at the time that she consented to and participated in same, and the ongoing pain and suffering that she has sustained since that time, she has suffered and continues to suffer great anguish and emotional distress.

26)    The conduct of the Army Experimenters, as complained of herein, was negligent and occurred during the course of, and while they were acting within the scope of, their employment.

27)    As a result of the conduct of the Army Experimenters, as complained of herein, Ms. Merrill was subjected to human experimentation without informed consent, which under the law of the Commonwealth of Massachusetts constitutes an act of negligence, a violation of the doctrine of informed consent, a negligent infliction of emotional distress, and a "*nonconsensual invasion of [her] bodily integrity*", a violation of *"the inviolability of [her] person,"* a violation of her "*right... to preserve... her right to privacy against unwanted infringements of bodily integrity*," and a violation of her "*constitutional right to privacy, [which] is an expression of the sanctity of individual free choice and self-determination as fundamental constituents of life*," as those concepts are referred to in *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728 (1977). See also, in this regard, Massachusetts General Laws c. 214, § 1B ("*A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages.*")

28)    Moreover, as a result of the fact that there was no therapeutic benefit to Ms. Merrill associated with the Experiment, the standard of care that was owed to Ms. Merrill with respect to securing her informed consent exceeded the standard of care that applies in cases involving therapeutic procedures, such as the procedures involved in *Superintendent of Belchertown State School, supra*, and approximated the standard evidenced by the *Declaration of Helsinki* (adopted by the Defendant United States of America as part of the Helsinki Accords on

Human Rights), by the _Nuremberg Code_ (adopted by the Defendant United States of America following World War II in response to experiments conducted by scientists working for the National Socialist government of Germany), and by federal regulations relating to informed consent such as 45 C.F.R. § 46.116(a)(2) (promulgated by the Defendant's Department of Health and Human Services.) _See generally_, in this regard, _Whitlock v. Duke University_, 637 F.Supp. 1463, 1467, 1470-1471 (M.D.N.C. 1986), citing, for the standard of care relating to informed consent in the context of non-therapeutic human experimentation, the _Declaration of Helsinki_, the _Nuremberg Code_, and 45 C.F.R. § 46.116(a)(2).

29)    If the Defendant in this case were a private party, the Defendant would be liable to Ms. Merrill for the conduct complained of herein under the laws of the Commonwealth of Massachusetts.

30)    Pursuant to 28 U.S.C. § 2675(a), the claim set forth herein was presented to the Department of the Army. The Department of the Army denied the claim on July 8, 2003.

31)    The Plaintiff brings this action on her own behalf and on behalf of all other similarly situated, as their interests may appear.

32)    All conditions precedent to the commencement of this action have been performed or have occurred or have been excused by reason of the conduct of the Defendant, as complained of herein.

## COUNT I
### (Violation of Common Law Obligations Relating to Informed Consent)

33)    The allegations set forth in paragraphs one through thirty-two above are hereby repeated as if expressly set forth herein.

34)    The conduct of the Army Experimenters, as complained of herein, violated common law obligations owed to Ms. Merrill with respect to informed consent, all to her great detriment and harm.

35)    For these and other reasons as may be shown at trial, the Defendant is liable to Ms. Merrill for violation of common law obligations relating to informed consent.

## COUNT II
### (Violation of Privacy)

36)    The allegations set forth in paragraphs one through thirty-two above are hereby repeated as if expressly set forth herein.

37)    The conduct of the Army Experimenters, as complained of herein, constituted an unreasonable, substantial or serious interference with Ms. Merrill's privacy, all to her great detriment and harm.

38)    For these and other reasons as may be shown at trial, the Defendant is liable to Ms. Merrill for violation of privacy.

## COUNT III
### (Negligence)

39)    The allegations set forth in paragraphs one through thirty-two above are hereby repeated as if expressly set forth herein.

40)    The conduct of the Army Experimenters, as complained of herein, violated the duty of care owed to Ms. Merrill by the Army Experimenters by virtue of the status and relationship of the parties and by virtue of the fact that they were undertaking to subject her to non-therapeutic, human experimentation, all to her great detriment and harm.

11

41)    For these and other reasons as may be shown at trial, the Defendant is liable to Ms. Merrill for negligence.

## COUNT IV
### (Negligent Infliction of Emotional Distress)

42)    The allegations set forth in paragraphs one through thirty-two above are hereby repeated as if expressly set forth herein.

43)    The conduct of the Army Experimenters, as complained of herein, constituted a negligent infliction of emotional distress upon Ms. Merrill, all to her great detriment and harm.

44)    For these and other reasons as may be shown at trial, the Defendant is liable to Ms. Merrill for negligent infliction of emotional distress.

### PRAYER FOR RELIEF

WHEREFORE Ms. Merrill respectfully requests that this Court enter judgment in favor of Ms. Merrill and against the Defendants:

1.    Awarding Ms. Merrill all damages sustained by reason of the conduct complained of herein, up to but not exceeding the amount set forth in her administrative claim: twelve million dollars ($12,000,000).

2.    Awarding Ms. Merrill such other and further relief as this Court may deem just and appropriate.

Respectfully Submitted
By her attorneys,

James F. Ring (#542569)
CHU, RING & HAZEL LLP
49 Melcher Street
Boston, MA 02210
Telephone (617) 443-9800 ext. 225
Telefax (617) 443-9840
E-mail: jring@chu-ring.com

Dated at Boston this 31st day of December, 2003